# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

YOLANDA L. FLOWERS,

      **Plaintiff,**

vs.                                            **No.  05cv0758 DJS**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**


## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Flowers') Motion to Reverse and Remand for a Rehearing **[Doc. No. 11]**, filed October 28, 2005, and fully briefed on December 16, 2005. On October 1, 2004, the Commissioner of Social Security issued a final decision denying Flowers' claim for disability insurance benefits.  Flowers seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is not well taken and will be DENIED.

## I.  Factual and Procedural Background

Flowers, now fifty-three (D.O.B. May 21, 1952), filed her application for disability insurance benefits on February 14, 2003, alleging disability since May 6, 2002 (Tr. 47A), due to degenerative disk disease.  Tr. 18.  Flowers has a twelfth grade education and past relevant work experience as a nursing assistant.  Tr. 18.  On October 1, 2004, the ALJ denied benefits, finding Flowers was not disabled as she could perform a full range of light work.  Tr. 21.  The ALJ found

Flowers' degenerative disc disease was severe within the meaning of the Regulations, but it did not meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart, P, Regulations No. 4.  Tr. 19.  Flowers filed a Request for Review of the decision by the Appeals Council.  On June 18, 2005, the Appeals Council denied Flowers' request for review of the ALJ's decision.  Tr. 5.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Flowers seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Flowers makes the following arguments: (1) the ALJ's RFC finding is contrary to the evidence; and (2) the ALJ's credibility finding is contrary to law.

## A.  Medical Records

On **April 10, 2002**, Laura Ulibarri, M.D., a physician with Rio Abajo Family Practice, evaluated Flowers.  Tr. 151.  Flowers complained of joint pain in her knees, ankles and shoulders. Flowers denied swelling or redness of the knees.  Flowers was taking Ibuprofen for the pain.  Dr. Ulibarri noted that Flowers' neuro/musculo/skeletal examination was essentially normal.  The extremities evidenced no deformities or tenderness.  Dr. Ulibarri diagnosed Flowers with arthralgias and ordered a CBC, a rheumatoid profile, and a sedimentation rate.  Dr. Ulibarri directed her to return in three weeks for a follow-up.

On **June 10, 2002**, Flowers returned for her follow-up with Dr. Uibarri.  Tr. 150.  The physical examination was **normal**.  The lab work was **normal**.  Flowers complained of pain in her shoulders, knees, and ankles for one year but reported she was **not taking any medication for the pain**.  Dr. Ulibarri diagnosed her with arthralgias, probable osteoarthritis and ordered x-rays of her knees and ankles, an ANA, and prescribed Celebrex (a nonsteroidal inflammatory drug). Dr. Ulibarri directed Flowers to return in one month.

On **September 16, 2002**,  Flowers returned for her follow-up with Dr. Ulibarri.  Tr. 149. On this day, Flowers complained of low back pain for two months with no history of trauma, or bowel or urination problems.  Flowers reported the pain in her knees, ankles and back worsened after working.  Flowers **denied redness or swelling of knees** and reported she was **not taking any medication for the pain.** The physical examination was essentially normal.  Specifically, Dr.

4

Ulibarri noted there was no palpable tenderness of the back, the gait was normal, there was good range of motion, **straight leg raising was positive**, there was mild tenderness of the right ankle, and the x-rays of the knees were normal.  Dr. Ulibarri diagnosed Flowers with low back pain and bilateral knee and ankle pain.  Dr. Ulibarri ordered x-rays of the L-S spine including the coccyx, more laboratory work (rheumatoid factor, sedimentation rate, urinalysis with culture and sensitivity), and prescribed Celebrex.  Flowers reported she had stopped taking the Celebrex "soon after starting it."  Tr. 149.  Dr. Ulibarri directed Flowers to return in one month.  The sedimentation rate, the rheumatoid factor, and the urinalysis and culture were negative.  Tr. 148.  The x-rays of the lumbosacral spine and coccygeal showed normal alignment and disc space narrowing at L5-S1 disc level.  Tr. 147.

On **September 19, 2002**, Dr. Ulibarri prescribed Vicodin as needed for pain.  Tr. 146.  On **October 4, 2002**, it was noted that Flowers received a refill of the Vicodin.

On **September 29, 2002**, the MRI of the lumbar spine showed "degenerative disc changes at L5-S1 with no evidence of a focal disc protrusion and no root sheath cyst in the sacrum."  Tr. 145.

On **December 2, 2002**, Ervin Hinds, M.D., a pain specialist, evaluated Flowers at Dr. Ulibarri's request.  Tr. 116-118.  Flowers was taking Vicodin twice a day.  Dr. Hinds noted her back was tender bilaterally over the sciatic notch.  **The straight leg raising was negative**.  Deep tendon reflexes were normal and sensory was intact in all the signature dermatomes.  Tr. 117.  Dr. Hinds noted the x-rays of the lumbar spine showed marked narrowing at L5-S1, and the September 29, 2002 MRI showed degenerative disk disease of the lumbar spine.  Dr. Hinds

administered an epidural block and directed Flowers to return to the New Mexico Pain and
Wellness Center in three to five days.

On **December 16, 2002,** Ted J. Esparza, a licensed physical therapist with NovaCare
Rehabilitation, formulated a treatment plan for Flowers.  Mr. Esparaza noted, "the patient
presents in clinic today **without radicular symptoms** but bilateral lower extremity weakness in
L5-S1 myotomes, along with myofacial pain . . . ."  Tr. 125.  Mr. Esparza opined the
rehabilitation potential and prognosis were excellent to good.  Flowers continued receiving
physical therapy until her physician discharged her.  Flowers was fitted for a TENS unit and
discharged to an independent home program.

On **January 23, 2003**, Flowers returned to see Dr. Hinds.  Dr. Hinds evaluated Flowers
and administered a "transforaminal epidural block on the right at L5-S1 and an S1 selective nerve
root entrance foraminal."  Tr. 111.  Dr. Hinds noted the pain center would follow-up with
Flowers in three to five days to determine if the procedure had been helpful to her before
considering an operative solution.

Flowers reported to Dr. Hinds that she had been experiencing low back pain and right leg
pain for about eighteen months.  Tr. 112.  Flowers rated the pain a 9 on a 10 point scale and
reported the December 2, 2002 interlaminar epidural block had markedly decreased the pain for
about two weeks.  Dr. Hinds performed a physical examination on Flowers, noting:

> Height 5 feet 3 inches.  Weight 122 pounds.  Blood pressure 115/60.  She is alert and
> cooperative. Cranial nerves II-XII are intact.  Her gait is slightly antalgic off the right.  There
> is tenderness bilaterally in both sciatic notch, more the right than on the left.  **Straight leg
> raising is negative.**  External rotation of the hips is somewhat limited bilaterally.  Deep
> tendon reflexes are +3 in the knees, +2 in the ankles.  Motor is 5/5.  Sensory is intact in all
> the signature dermatomes.

Tr. 112 (emphasis added).  Dr. Hinds also noted that "x-rays of lumbar spine show marked narrowing at L5-S1.  An MRI done on 9/29/02 showed degenerative disk disease of the lumber spine most prominent at L5-S1.  Also prominent S2 and 3 nerve roots on the right."  *Id.*

On **April 3, 2003**, Dr. Mark D. Erasmus, M.D., a neurosurgeon with New Mexico Neurosurgery, evaluated Flowers.  Tr. 130-132.  Dr. Erasmus performed a physical examination which was essentially normal.  Dr. Erasmus noted the following:

> EXAMINATION:
> General Appearance:
> Physical examination revealed a well developed, well nourished female whose gait is slow and deliberate.
>
> Forward bending produces more pain, rotation does not produce pain, light touch and axial loading do not produce pain.  **Straight leg raising is negative.**  Patrick's maneuver is negative. There is no pain to percussion of her heels.  Reflexes are present and equal. Sensory examination (lumbar): Pinprick is intact in selected cervical, thoracic, all lumbar and S1 dermatomes.  Vibration and position sense are intact.
>
> Motor examination (lumbar): No wasting, no involuntary movement, normal tone in the upper and lower extremities, normal positioning of the extremities, normal strength in the deltoids, biceps, triceps, intrinsics, grasps, knee flexion and extension, foot dorsi and plantar flexion tested in the upright position.  No pronator drift with arms extended.  Finger to nose exam is normal.
>
> Data Reviewed:  MRI shows a degenerative disc at L5-S1 without any foraminal or canal compromise.
>
> Impression: I think this is somewhat of a diagnostic dilemma.  The patient does not have signs of symptom magnification, yet she has nondermatome distribution of sensory loss and I do not think that this can all be related to the L5-S1 disc degeneration.
>
> Plan:  I think that maybe an evaluation by neurology would be in order including nerve conduction studies since sensory loss is a portion of her symptoms.

Tr. 131, 132 (emphasis added).

On **April 14, 2003**, Flowers returned to see Dr. Ulibarri.  Tr. 141.  Flowers complained of low back pain that radiated down her right leg.  Flowers reported the epidural injection did not

help.  Flowers stated Dr. Erasmus had informed her that surgery was not a solution.  Dr. Ulibarri diagnosed Flowers with leg pain and paresthesias.  Dr. Ulibarri ordered laboratory work and referred Flowers to a neurologist.  On **April 16, 2003,** the laboratory report showed normal results.  Tr. 139, 140.

On **April 23, 2003**, Manuel A. Gurule, M.D., a neurologist with New Mexico Neurology Associates, evaluated Flowers for complaints of right lower extremity paresthesias, low back pain and leg pain.  Tr. 134-136.  Flowers provided the following history:

> Ms. Flowers reports that she has had these symptoms for approximately one year.  She has had low back pain and leg pain all the way down to her ankle.  She feels that she has also had some mild weakness of leg and a heavy feeling of the leg when she lies down.  This has been constant.  The pain in her lower back does radiate into the legs towards the ankles.  She feels that her legs are somewhat shaky and weak in the mornings, and she has been using a **TENS unit for relief, which does provide significant relief**.  She has had an epidural injection on December 2, 2002, which did not provide relief.  She had a repeat injection on January 3, 2003, which again did not provide significant relief.  She did report that she noticed more weakness of her lower extremities since her epidural injection on January 23, 2003.  She has not had any bowel or bladder incontinence.  She has not had any numbness.  She has possibly had some tingling of her feet and ankles only.  Her symptoms are There (sic) no aggravated if she is on her legs and feet "too long."  They are not aggravated by movement or coughing.  Heat provides relief as well as a tens unit.  There is no bowel or bladder incontinence.

Tr. 134.  At that time, Flowers reported taking Lortab twice a day.  Dr. Gurule performed a nerve conduction study and an electromyography.  The physical examination was essentially normal.

Dr. Gurule's found:

> IMPRESSION: Low back pain and leg pain with **subjective leg weakness**.  Ms. Flowers **does not have any objective leg weakness** on her exam today, although she does have some stiffness and slowness of her leg movements.  **Her electromyography studies and nerve conduction studies of both extremities performed today were normal, <u>showing no electrical evidence  of a neuropathy, radiculopathy,</u> or plexopathy, contributing to her symptoms, based on the nerves and muscles studied**.
>
> Her symptoms are likely due to degenerative changes in the lumbar spine.

> Of note, Ms. Flowers was seen by Dr. Erasmus of New Mexico Neurosurgery, who did not feel that she was a surgical candidate.
>
> The nerve root sheath cysts seen on her MRI can sometimes cause some lower back pain, although typically in this location, would not necessarily explain her leg pain, and certainly would not cause any weakness of her extremities. **Apparently neurosurgery did not feel that these are symptomatic in her case.**

Tr. 136. Dr. Gurule prescribed amitriptyline (Elavil- used for the treatment of depression and chronic pain). In case the amitriptyline was not effective, Dr. Gurule recommended Neurontin. Additionally, Dr. Gurule advised Flowers to continue physical therapy and the TENS unit.

**On June 11, 2003**, Michael P. Finnegan, M.D., completed an RFC assessment. Tr. 161-168. Dr. Finnegan opined Flowers retained the RFC to perform light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [Flowers] must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b). Dr. Finnegan reviewed the records, noting:

> 51 y.o. woman with a history of low back pain and leg weakness. She has been evaluated by both Neurosurgery and neurology. X-rays shows narrowing of L5-S1. MRI shows evidence of degeneration of L5-S1 **without any herniation or nerve impingement**. Exams indicated a normal gait, normal muscle and sensory function. **SLR (straight leg raise) is negative**. EMG/NCS normal. She does have an impairment that causes pain which would limit her as above. Her daily activities are only moderately affected.

Tr. 162.

On **August 18, 2003**, Flowers saw Dr. Sandoval for severe pain in her lower back and in her left hip. Tr. 173. The record indicates the pain was a "long standing and chronic pain problem." *Id.* Flowers reported she had been evaluated at Ana Kaseman Hospital for the pain.

At that time, Flowers listed her current medications as Lortab and Alleve.  The physical examination was normal.  Dr. Sandoval noted Flowers was in no acute distress.  Dr. Sandoval assessed Flowers with chronic back pain, requested Flowers' medical records, and referred her to Dr. Gelinas.

On **August 27, 2003**, Flowers returned for a follow-up with Dr. Sandoval.  Tr. 172.  The physical examination was normal except for "left hip tenderness over bursa and pain with movement."  Dr. Sandoval assessed Flowers with low back pain and ordered an MRI of the spine, a bone density test, and prescribed Lortab.  Dr. Sandoval noted Flowers had an appointment with Dr. Gelinas on September 8, 2003.

On **September 8, 2003**, Claude D. Gelinas, M.D., an orthopedic spinal surgeon, evaluated Flowers at Dr. Sandoval's request.  Tr. 178.  The neurological examination indicated "**negative straight leg raising, grossly normal sensory examination, no focal motor weakness, no atrophy, or edema, and pulses [were] present**."  Tr. 179.  Dr. Gelinas reviewed Flowers' x-ray of the lumbar spine (Tr.180) and MRI scan (Tr. 176) and noted they showed "severe degenerative collapse with arthropathy at the L5-S1 level."  Dr. Gelinas explained to Flowers that she could continue to live with her symptoms or consider a one level fusion.  The MRI scan showed "degenerative disc changes at L5-S1 with no evidence of a focal disc protrusion.  No root sheath cyst in the sacrum."  Tr. 176.

On **September 24, 2003**, Flowers returned to Dr. Sandoval for the MRI results.  Tr. 171.  The physical examination was normal and Dr. Sandoval noted Flowers was in no acute distress.  Dr. Sandoval assessed Flowers with chronic low back pain and discussed chronic pain management with Flowers and the need to decrease the Lortab to one a day.  Dr. Sandoval

10

prescribed Neurontin 300 mg for one day, one tablet twice a day for one day, and one tablet three times a day. Flowers was to continue on the last dosage. Dr. Sandoval also noted she would get a second opinion from another orthopedist.

On **October 22, 2003**, Flowers had a bone scan of the left hip and the lumbar spine at the Osteoporosis Diagnostic Center. Tr. 186. The results were forwarded to Dr. Sandoval. The bone scan indicated "no evidence of spinal fractures in the thoracic or lumbar regions." Tr. 184. The results for the bone scan for the left hip were normal (Tr. 186), but the bone scan of the lumbar spine indicated Flowers had osteopenia (Tr. 185– decreased calcification or density of bone).

On **November, 3, 2003**, Flowers returned for a follow-up with Dr. Sandoval. Dr. Sandoval performed a physical examination on Flowers which was normal. Tr. 183. Dr. Sandoval noted Flowers reported "**no increased pain**"and "**off Vicodin/ Lortab**." *Id.* Flowers had also **discontinued the Neurontin** on October 25th due to side effects which she reported as increased sedation, bloating, and abdominal pain. At that time, Dr. Sandoval noted under "Current Med," Tens Unit and Elavil at bedtime. Dr. Sandoval prescribed calcium 1500 mg, vitamin D 400 mg, Evista 60 mg (for the treatment and prevention of osteoporosis), and Celebrex. Dr. Sandoval directed Flowers to return as needed.

On **May 24, 2004**, Flowers returned to see Dr. Sandoval with complaints of "sinus infection for two weeks." Tr. 182. Dr. Sandoval noted Flowers' current medications were Evista, Celebrex, and Elavil. Dr. Sandoval assessed Flowers with sinusitis, osteoporosis, and fibromyalgia.

11

On **May 28, 2004**, Flowers returned for a follow-up with Dr. Sandoval.  Tr. 181.  Flowers reported she was **feeling much better**.  Dr. Sandoval assessed Flowers as having "resolving sinusitis" and fibromyalgia.  Dr. Sandoval prescribed Neurontin twice a day as tolerated.

## B.  ALJ's RFC Determination

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  Thus, the RFC is "the most [a claimant] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  Moreover, the RFC assessment is an administrative finding, reserved solely to the ALJ and based upon the totality of the evidence of record.  20 C.F.R. §§ 404.1545(a)(3) & 404.1546(c).

Flowers contends the ALJ erred in finding she retained the RFC to perform a full range of light work for the following reasons:  (1) the ALJ's finding that she had no radiculopathy[1] in her lower extremities is not supported by substantial evidence; (2) there is no "positive" evidence that she can perform the walking, standing and sitting required by light work; and (3) the ALJ failed to explain how he determined her RFC.

---

[1] Radiculopathy is defined as a disorder of the spinal nerve roots.  *Stedman's Medical Dictionary* 1484 (26th ed. 1995).  Osteoarthritis, especially in the cervical and lumbar regions, may compress isolated nerve roots.  Nerve root dysfunction causes a characteristic radicular syndrome of pain and segmental neurologic deficit.  Physicians administer the straight leg raise test to see if radicular symptomotology is reproduced.  Ventral (motor) root involvement causes weakness and atrophy of a muscles innervated by the root.  Dorsal (sensory) root involvement causes sensory impairment in a dermatomal distribution.  The corresponding segmental deep tendon reflexes are depressed or absent.  *The Merck Manual* 450, 1488 (17th ed. 1999).

### 1)  ALJ's Finding of No Evidence of Significant Radiculopathy

Flowers contends that the ALJ's finding that she had no radiculopathy is not supported by the evidence.  After reviewing the evidence, the ALJ found:

> In summation, there is **no evidence of significant radiculopathy** in the claimant (sic) lower extremities **as reflected in the EMG and nerve conduction studies**.  There was **no neurological deficits shown**, although x-rays showed marked narrowing at L5-S1 and degenerative changes in the lumbar spine.  Consequently, the undersigned concludes that the claimant's alleged symptoms and functional limitations are not wholly supported by the objective medical evidence and appear to be in excess of what would be expected from actual clinical findings.

Tr. 21(emphasis added).  Substantial evidence supports this finding.  On  April 23, 2003, Dr. Gurule, a neurologist, noted, **"**Her electromyography studies and nerve conduction studies of both extremities performed today were **normal**, showing **no** electrical evidence  of a neuropathy, **radiculopathy,** or plexopathy, contributing to her symptoms, **based on the nerves and muscles studied**."  Tr. 136(emphasis added).

Additionally, the medical evidence belies Flowers' contention and shows that on **December 2, 2002**, Dr. Hinds, a pain specialist, performed a  physical examination on Flowers and noted her "**straight leg raising was negative**," her "deep tendon reflexes were normal," and her "sensory was intact in all the signature dermatomes."  Tr. 117.  On **December 16, 2002,** Ted J. Esparza, a licensed physical therapist also noted "patient presents in clinic today **without radicular symptoms** . . . ."  Tr. 125.  On **January 23, 2003**, Dr. Hinds again examined Flowers and noted, "**Straight leg raising is negative**."  Tr. 112.  On **April 3, 2003**, Dr. Erasmus evaluated Flowers and noted, "**Straight leg raising is negative**."  Tr. 131.  On **September 8, 2003**, Dr. Gelinas  evaluated Flowers and noted , noting, "**negative straight leg raising**, **grossly normal sensory examination, no focal motor weakness, no atrophy, or edema, and pulses**

13

**[were] present**."   Tr. 179.  In fact, the only time Flowers' straight leg raising was noted as positive was on September 16, 2002.  Tr. 149.

In support of her contention that the ALJ erred in finding that she had no radiculopathy, Flowers points to the record and argues that "[i]n December 2002 and in January 2003 Dr. Hinds noted that [she] had been suffering from constant lower back pain, radiating into the right leg and ankle, for one and a half years."   Mem. in Support of Mot. to Reverse or Remand at 9.  Flowers also contends "Dr. Gurule noted that her back pain radiates into her legs toward her ankles." *Id.* However, a review of the record indicates that on **December 2, 2002**, Flowers reported to Dr. Hinds that she "had bilateral leg pain for one-and-a-half- years" that was "constant" and "low back pain"  that "radiates down into her ankles."  Tr. 117.  These were Flowers' subjective complaints reported under "History of Present Illness" in Dr. Hinds' evaluation.  Tr. 116-118. However, the physical examination was essentially normal:  "She has a stiff gait without any antalgia.  Examination of the back there is tenderness bilaterally over the sciatic notch.  **Straight leg raising is negative.  External rotation both hips is somewhat limited.  Deep tendon reflexes are 2+3 in the knees, +2 in the ankles.  Motor is 5/5.  Sensory is intact in all the signature dermatomes.**"  Tr. 117.

The same holds true for statements Flowers attributes to Dr. Gurule.  In a letter dated **April 23, 2003**, Dr. Gurule informed Dr. Ulibarri, "Ms. Flowers reports that she has had these symptoms for approximately one year.  She has had low back pain and leg pain all the way down to her ankle.  She feels that she has also had some mild weakness of leg and a heavy feeling of the leg when she lies down."  Tr. 134.  However, the examination was essentially normal.  Dr. Gurule was very clear when he noted, "Low back pain with **subjective** leg weakness."   Tr. 136.

Significantly, Dr. Gurule found "the electromyography studies and nerve conduction studies of both lower extremities were normal, showing **no electrical evidence of a neuropathy, radiculopathy or plexopathy, contributing to her symptoms** . . . ." *Id.*   Hence, Flowers' statement that "[t]here is only one medical record that states that [she] had no radiculopathy," is not supported by the record.  Accordingly, substantial evidence supports the ALJ's finding that there was no evidence of significant radiculopathy in Flowers' lower extremities as reflected in the EMG and nerve conduction studies.

## 2)  "Positive" Evidence of Ability to Walk, Stand, and Sit & RFC Determination

Flowers next contends that "there is no *positive* evidence that [she] can perform the walking, standing and sitting required by [light] work."  Mem. in Support of Mot. to Reverse or Remand at 9.  Flowers relies on *Adkins v. Barnhart*, 80 Fed.Appx. 44 (10th Cir. 2003) to support her contention.  *Adkins* is readily distinguishable and must be read against its facts.  In *Adkins*, the ALJ denied Adkins disability claim at step five of the sequential evaluation process, finding that although Adkins could not return to his past heavy, unskilled work, he retained the RFC to perform the full range of light work and was thus not disabled under Rule 202.17 of the Medical-Vocational Guidelines (the grids), *see* 20 C.F.R., pt. 404, subpt. P, app. 2.  *Id.* at *47.  The Court of Appeals for the Tenth Circuit reversed the ALJ's decision, finding:

> In this case, the ALJ decided that claimant retains the RFC for the full range of light work, **without pointing to any evidence to support his conclusion**.  The **only document** that could conceivably support the conclusion **is a checkmark-style RFC assessment done by an agency physician**.  There are two problems with this document.  First, we have long held that "[such] [checkmark-style] evaluation forms, **standing alone**, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence."  This RFC assessment carries a few handwritten lines of notes from the medical evidence, a statement that the assessment is based on the medical evidence, and a conclusion that claimant is not entirely credible.  Because the agency physician provided no thorough explanation, however, the RFC assessment does not constitute substantial evidence under *Frey*.  Second, there is no record

evidence to support the conclusions on the form in any event. Of crucial importance to this case is that no doctor has ever defined claimant's capability for walking, standing or sitting, let alone, bending, twisting, stooping, climbing, etc. There is a total lack of evidence about what he can do. Although Dr. Schoenhals and Dr. Metcalf (claimant's workers' compensation examiner) stated that claimant should be retrained for work other than his past heavy work, they did not define either the level of exertion that claimant could perform or the limitations, if any, on his movement or posture on account of his fusion or his pain. For these reasons, the ALJ could not make any RFC determination– there is no evidence for it.

*Id* at *48. Thus, in *Adkins*, the Court of Appeals found the ALJ's RFC determination lacking because he (1) did not "point to any evidence" to support his conclusion; and (2) the agency physician's "checkmark-style RFC assessment" was unaccompanied by thorough written reports or persuasive testimony and the agency physician provided no thorough explanation.

In contrast, in this case the ALJ set forth the evidence, which was substantial, supporting his RFC determination. The ALJ found:

The undersigned must determine whether the claimant retains the residual functional capacity to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy. The term "residual functional capacity" is defined in the Regulations as the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks (20 C.F.R. §404.1527 and Social Security Rulings 96-2p and 96-6p).

In making this assessment, the undersigned must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. §404.1529 and Social Security Ruling 96-7p. The undersigned must also consider any medical sources that reflect judgments about the nature and severity of the impairment and resulting limitations (20 C.F.R. §404.1527 and Social Security Ruling 96-2p and 96-6p).

Although the claimant admitted to having no specific back injury, her back problems began in May of 2000. the problem was described as weakness and numbness down the anterior and posterior aspects of both legs with pain across the back which occurred when she was on her feet or when she sat too long. The claimant testified that she is able to sit 20-25 minutes, stand 15-20 minutes, walk 1 block, lift 10 pounds and has difficulty with bending. The claimant stated that she has constant pain in her pelvis/hip area that goes down her legs. She said that she is able to take care of her personal needs and do housework and laundry, although she was able to do this only in 20 minute increments. She stated that she does stretching exercises and takes walks. She also said her appetite is poor, but her sleeping habits have been good with medication.

16

Ms. Sandoval (sic) was initially treated by Dr. Laura Ulibarri, beginning in April of 2002, for joint pain in her shoulders, knees and ankles which were diagnosed as arthralgias, probable osteoarthritis. On follow-up examination in September of 2002, the claimant stated that she had been having low back pain for 2 months. X-rays of the knees were essentially normal and indicated early chondrocalcinosis (Exhibit 5F/17). An x-ray of her lumbosacral spine and coccygeal bone showed disc space narrowing at L5-S1 with no demonstrable fracture or acute bony process visible throughout sacrococygeal bone (Exhibit 5F/11).

Ms. Flowers was treated in December of 2002 at the New Mexico Pain and Wellness Center for constant low back pain and bilateral leg pain which radiated down into her ankles. X-rays of the lumbar spine showed marked narrowing at L5-S1. An MRI dated September 29, 2002, showed degenerative disk disease of the lumbar spine. On examination, the claimant had some bilateral tenderness in both sciatic notches. Her straight leg raise was negative. The claimant was treated with two epidural blocks, but without relief. She was sent for rehabilitation. Objective findings on her initial evaluation showed that range of motion of her lumbar spine was within normal limits with some pain noted with flexion. The claimant was assessed to be without radicular symptoms, but had bilateral lower extremity weakness in L5-S1 myotomes. She was given an excellent to good prognosis and placed on a stabilization program with extensive stretching exercises (Exhibit 1F, 2F).

The claimant was sent to Dr. Mark Erasmus for a neurosurgical consultative examination on April 3, 2003. On examination, the findings showed forward bending produced pain, but rotation did not. Both straight leg raising and Patrick's maneuver was (sic) negative. Sensory examination of the lumbar spine indicated pinprick was intact in selected cervical, thoracic, and all lumbar and S1 dermatomes, including vibration and position sense. The motor examination of her lumbar was normal to both upper and lower extremities. Dr. Erasmus' opinion was a diagnostic dilemma, indicating the claimant had non-dermatome distribution of sensory loss not related to the L5-S1 disc degeneration. Dr. Erasmus suggested a neurologist consultation to include nerve conduction studies (Exhibit 3F).

A neurologist consultative examination on April 23, 2003, by Dr. Manuel Gurule revealed that the claimant had no objective leg weakness although she had some stiffness and slowness of her leg movements. The electromyography studies and nerve conduction studies of both lower extremities were normal, showing no neuropathy, radiculopathy or plexopathy. His assessment was that her symptoms were likely due to degenerative changes in the lumbar spine and referred to Dr. Erasmus' analogy that she was not a surgical candidate (Exhibit 4F).

Ms. Flowers was treated by Dr. Martha Chipi-Sandoval for chronic pain management and sciatic pain in her left hip and both legs. MRI of he lumbar spine showed significant degenerative disc disease at L5-S1 and no evidence of focal disc protrusion or spinal stenosis (Exhibit 8F/5). A bone density evaluation indicated osteopenia (Exhibit 10F/4). The claimant was placed on Neurontin with a diagnosis of fibromyagia (sic) (Exhibit 8F, 10F).

Ms. Flowers was evaluated by Dr. Claude Gelinas on September 8, 2003. She complained of back and upper thigh pain, indicating that her back hurt when bending, twisting or lifting, as well as prolonged sitting and standing. On examination, Dr. Gelinas indicated that rotation

of the back was limited, but she could flex to 30 degrees and extend to 10 degrees. She had no gross involuntary spasms. Neurologically, Dr. Gelinas found the claimant had negative straight leg raising, grossly normal sensory exam, no focal motor weakness and no atrophy or edema. Pulses were also present. His radiology report showed severe degenerative collapse with facet arthropathy at the L5-S1 level with no gross instability noted. His options were to continue to live with symptoms or to consider a one level fusion (Exhibit 9F).

The non-examining state agency physician who reviewed the documentary evidence at the initial and reconsideration levels of administration review opined that the claimant could perform work at the light exertional level (Exhibit 6F).

The claimant has had symptom-producing medical problems with her back, but the undersigned finds that her testimony and other evidence do not credibly establish functional limitations to preclude her from all sustained work activity. Drs. Erasmus and Gurule, who are specialists in their field, after reviewing the objective medical evidence, felt that the claimant was not a surgical candidate. Their opinion may or may not be contrary to that of Dr. Gelinas. Considering the claimant's daily activities and the record as a whole, the undersigned finds that, although the claimant may not be able to perform her past relevant work, she has the capacity to perform a lighter job. Furthermore, there are no treating or examining source statements indicating the claimant is unable to engage in work activity.

In summation, there is no evidence of significant radiculopathy in the claimant (sic) lower extremities as reflected in the EMG and nerve conduction studies. There were no neurological deficits shown, although x-rays showed marked narrowing at L5-S1 and degenerative changes in the lumbar spine. Consequently, the undersigned concludes that the claimant's alleged symptoms and functional limitations are not wholly supported by the objective medical evidence and appear to be in excess of what would be expected from actual clinical findings.

Accordingly, the undersigned finds the claimant retains the residual functional capacity to perform a full range of light work.

Tr. 19-21. It is clear from the ALJ's decision that in determining Flowers' RFC he set forth all the objective medical evidence, considered Flowers' daily activities and her subjective complaints, and considered Dr. Finnegan's opinion regarding Flowers' RFC. Dr. Finnegan also set forth the evidence supporting his conclusions. Tr. 162. Unlike the "checkmark-style" evaluation form criticized by the court in *Adkins*, in this case, Dr. Finnegan's RFC assessment is supported by substantial evidence and comports with *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987).

Significantly, in arriving at an RFC for light work, Dr. Finnegan factored in Flowers' pain impairment and opined Flowers could not return to her former job as a nursing assistant.  Tr. 162 ("She does have an impairment that causes pain which would limit her as above.").

Flowers maintains "there is no description by a doctor of her physical capabilities or limitations with respect to sitting, standing and walking."  Mem. in Support of Mot. to Reverse and Remand at 9.  The Court disagrees.  Dr. Finnegan set forth Flowers' limitations with respect to sitting, standing, and walking.  Tr. 161-168.  As already noted, Dr. Finnegan's RFC assessment comports with *Frey*.

Additionally, the medical records must be consistent with the nonmedical testimony as to the severity of pain and limitations.  *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990).  Flowers' testimony regarding the severity of her pain and limitations are not consistent or supported by the objective medical evidence.  As evidenced in the record, on November, 3, 2003, Flowers reported she had "no increased pain" and was off the Vicodin and the Lortab.  Tr. 183.  Flowers also reported she had discontinued the Neurontin.  At that time, Flowers reported she was using her TENs unit and Elavil at night.  Dr. Sandoval directed Flowers to return as needed.  Flowers did not return to see Dr. Sandoval until May 24, 2004, and then complained of a "sinus infection."  Tr.  182.  At that visit, Flowers reported she was not taking any medication for pain.  *See also*, Tr. 149 (September 16, 2002–  physical examination normal, not taking any medication for pain, no palpable tenderness of back, normal gait, good range of motion, x-rays of the knees were normal); Tr. 148 (Septemhber17, 2002– sedimentation rate, rheumatoid factor, and urinalysis and culture negative); Tr. 147 (September 17, 2002– X-rays of the lumbosacral spine and coccygeal showed normal alignment and disc space narrowing at L5-S1 disc level); Tr. 116-

19

118 (December 2, 2002– straight leg raising negative, deep tendon reflexes normal, sensory intact in all the signature dermatomes); Tr. 125 (December 16, 2002–  no radicular symptoms, rehabilitation potential and prognosis excellent to good); Tr. 112 (January 23, 2003– straight leg raising negative, DTRs normal, sensory intact in all the signature dermatomes); Tr. 130-132 (April 3, 2003– normal physical examination, straight leg raising negative, Patrick's maneuver is negative, no pain to percussion of heels, reflexes present and equal, sensory examination normal, motor examination normal, i.e., no wasting, no involuntary movements, normal tone in upper and lower extremities, normal positioning of the extremities, normal strength, in the deltoids, biceps, triceps, intrinsics, grasps, knee flexion and extension, foot dorsi and plantar flexion); Tr. 134-136 (April 23, 2003– normal physical examination, nerve conduction study and electromyography of both extremities indicate no electrical evidence of neuropathy, radiculopathy, or plexopathy, no objective leg weakness; TENS unit provided significant relief ); Tr. 173 (August 18, 2003– normal physical examination normal, in no acute distress); Tr. 172 (August 7, 2003– physical examination with exception of left hip tenderness); Tr. 178 (September 8, 2003– negative straight leg raising, grossly normal sensory examination, no motor weakness, no atrophy, no edema, pulses present); Tr. 183 (November 3, 2003– normal physical examination, no increased pain, off Vicodin and Lortab, had discontinued Neurontin).

## C.  Credibility Determination

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v.*

*Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988). However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility. *Id.* The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility. *Id.*

In evaluating a claimant's credibility regarding pain, the ALJ must consider the level of medication the claimant uses and its effectiveness, the claimant's attempts to obtain relief, the frequency of medical contacts, the claimant's daily activities, subjective measures of the claimant's credibility, "and the consistency or compatibility of nonmedical testimony with objective medical evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th 1995) (quotation omitted)(emphasis added). The inability to work pain-free is not sufficient reason to find a claimant disabled. *See Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

Flowers claims the ALJ's finding that her complaints of pain were not credible is erroneous. Mem. in Support of Mot. to Reverse and Remand at 11. However, Flowers misconstrues the ALJ's credibility determination. The ALJ did not find that Flowers was not credible. Rather, the ALJ found she "had symptom-producing medical problems with her back, but [ ] that her testimony and other evidence [did] not credibly establish functional limitations to preclude her from all sustained work activity." Tr. 21. Additionally, after setting forth the evidence to support his credibility determination, the ALJ found:

> In summation, there is no evidence of significant radiculopathy in the claimant's lower extremities as reflected in the EMG and nerve conduction studies. There were no neurological deficits shown, although x-rays showed marked narrowing at L5-S1 and degenerative changes in the lumbar spine. Consequently, the undersigned concludes that the claimant's alleged symptoms and functional limitations are not wholly supported by the objective medical evidence and appear in excess of what would be expected from actual clinical findings.

Id.  Thus, the ALJ found Flowers' testimony regarding her limitations was not credible to the extent alleged and not wholly supported by the evidence.  The ALJ recognized that Flowers' "x-rays showed marked narrowing at L5-S1 and degenerative changes in the lumbar spine," nonetheless he found that the "objective medical evidence" did not support her "functional limitations" to the extent alleged.  Because substantial evidence supports the ALJ's credibility determination, the Court will not upset it.

 **D.  Conclusion**

It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1994). The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied. After such review, the Court is satisfied that substantial evidence supports the ALJ's RFC determination and his finding of nondisability.  Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.


**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**